**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**BECKLEY DIVISION**

VIA AIRLINES, INC.,

      Plaintiff,

                               CASE NO:     5:18-cv-00038

v.

GREENBRIER COUNTY
AIRPORT AUTHORITY,

      Defendant.

_____/

<u>**VERIFIED COMPLAINT**</u>
**(REQUEST FOR EMERGENCY INJUNCTIVE RELIEF)**

      COMES NOW, the Plaintiff, VIA AIRLINES, INC. ("Via"), by and through its undersigned counsel, and hereby files this Verified Complaint and Request for Emergency Injunctive Relief against the Defendant, GREENBRIER COUNTY AIRPORT AUTHORITY ("Airport Authority"), and in support thereof, states as follows:

      1.     This action is filed to urgently prevent the Airport Authority's continued and illegal attempts at regulating an air carrier's routes and services in direct violation of the Airline Deregulation Act ("ADA"). 49 U.S.C. § 41713.

      2.     In particular, the Airport Authority has and continues to take harmful action in an effort to disrupt Via's operations as a United States Department of Transportation ("DOT") air carrier; the Airport Authority has continuously obstructed Via's operations by imposing unnecessary, unlawful, and illegal obligations upon Via in an effort to thwart Via's obligations to the DOT and the consuming public.

## I.      PARTIES

3.      Via is a Delaware corporation with its primary place of business at 218 Jackson Street, Maitland, Florida 32751.

4.      The Airport Authority, is a public agency established under W. Va. Code, § 8-29a-1, *et seq.*, authorized and empowered to maintain and operate a public airport and to enter into contracts with any company for the purpose of maintaining and operating a public airport.  W. Va. Code, § 8-29a-3(a).

## II.     JURISDICTION, AND VENUE

5.      This action arises, in part, under the Supremacy Clause of the United States Constitution (U.S. Const. Art. VI, cl. 2). The Court has original jurisdiction pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under the Constitution and laws of the United States. The Court has supplemental jurisdiction over Via's state-law claims pursuant to 28 U.S.C. § 1367, because those claims are so related to Via's federal-question claim that they form part of the same case or controversy.

6.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) in that this is a civil action wherein the matter in controversy exceeds $75,000.00, exclusive of interests and costs, and there is complete diversity of citizenship between the parties.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b) in that a substantial part of the events giving rise to Plaintiff's claims occurred in the District. In addition, the parties have expressly agreed to jurisdiction and venue of federal or state courts in the State of West Virginia. Exh. 2 at § 1310 and Exh. 3 at § 10.1.

## III.    GENERAL ALLEGATIONS

8.      Via is an air carrier, certified under the DOT and Federal Aviation Administration's ("FAA") regulations, and is engaged in the operation of providing commercial air transportation throughout the country.

9.      Via currently provides air carrier services at the Greenbrier Valley Airport in Lewisburg, West Virginia ("Airport"). The Airport is owned and operated by the Airport Authority.

## IV.    THE DOT's ESSENTIAL AIR SERVICES PROGRAM

10.     The Airline Deregulation Act of 1978 gave airlines substantial freedom to determine which domestic markets to serve and the airfares to charge the consuming public. This raised a concern for small communities with relatively low passenger levels.  They would lose service as carriers shifted their operations to serve larger and often more profitable markets.

11.     To address this concern, Congress established the Essential Air Service ("EAS") program to ensure that small communities would continue to receive scheduled passenger service, with federal subsidies when necessary.

12.     The EAS program is administered by the Office of the Secretary of the DOT, which enforces the eligibility requirements, determines the level of service required at eligible communities, designates the selected air carrier, and specifies service pattern.

13.     Typically, the DOT issues a request for proposals ("RFP") to air carriers to provide service to an eligible community and institutes a carrier selection proceeding using a bid system. It is required by law to use the following four key criteria when considering carriers' proposals to provide subsidized service to EAS communities: service reliability; contractual and marketing

arrangements with a larger carrier at the hub; interline arrangements with a larger carrier at the hub; and community views. *See* 49 U.S.C. § 41733(c)(1).

14.     The RFP advises air carriers that their proposals for subsidy should be submitted on a sealed bid, "best and final" basis, and set forth the level of service (frequency, aircraft size, and potential hubs) that would be appropriate for the community given its location and traffic history.

15.     Thereafter, the DOT issues a decision designating the selected air carrier and specifying the service pattern (routing, frequency, and type of aircraft), annual subsidy rate, and effective period of the rate. The DOT generally establishes two-year EAS service contracts.

16.     Under the EAS program, the DOT pays a subsidy as an incentive to air carriers who agree to provide air services to eligible small communities.

**V.     THE DOT SELECTED VIA AS AN EAS CARRIER FOR THE GREENBRIER AIRPORT**

17.     On March 28, 2016, the DOT issued an RFP for EAS at the Airport. *See* Order 2016-3-33. In response to the solicitation, Via submitted multiple proposals to provide EAS services.

18.     Following the bid process, on September 13, 2016, the DOT designated Via as the selected carrier citing Via's "proven record of providing reliable air service in West Virginia." *See* Order 2016-9-10.

19.     The DOT specified the subsidy rate for flights for the Airport and directed Via to schedule 24 flights per week.

20.     Via was selected as the carrier for the two-year period from October 1, 2016, through November 30, 2018. A copy of the DOT's Order Selecting Via and Establishing Subsidy Rates is attached hereto as **EXHIBIT 1**.

## VI.    VIA'S AGREEMENTS WITH THE AIRPORT AUTHORITY

21.    In order to carry out the EAS services for the DOT and the consuming public, Via entered into two separate agreements with the Airport Authority on September 30, 2016 (collectively, the "Airport Agreements").

22.    First, the "Airport Use and Lease Agreement" grants Via's aircraft, passengers, and personnel use of the Airport's runways, terminals, and other facilities. This agreement grants Via permission to use and access various common use spaces at the Airport, including the Airfield Operations Area, roadways, taxiways, taxi lanes, runways, apron areas, terminal building, gate areas, baggage areas, storage facilities, and other public areas. A true and correct copy of the Use and Lease Agreement is attached hereto as **EXHIBIT 2**.[1]

23.    In addition, Via is granted permission to use and access an Exclusive Use Space within the terminal building, which encompasses Via's operational, administrative, and ticket counter space, whereby Via is granted the right to occupy and use to the exclusion of others. Exh. 2 at § 402.

24.    Based on this promised use and access, Via agreed to pay the Airport Authority a monthly rent of $12,500 USD. Exh. 2 at §§ 501, 506. In addition, based on this promised use and access, Via agreed to pay the Airport Authority for landing fees, security fees, and other fees and charges from time to time. *Id*. at §§ 502-03.

---

[1] The Airport Use and Lease Agreement mistakenly lists Via Air, LLC as the contracting party. Via Air, LLC is a shareholder and parent company for Via Airlines, Inc., the actual air carrier. Via Air, LLC is not an authorized air carrier, does not fly or operate aircraft, and is not permitted to perform scheduled aviation services. The parties clearly intended and operated under Via Airlines, Inc. aviation certificates. The correct contractual party to this agreement is the Plaintiff, Via Airlines, Inc.

25.     Finally, under the Use and Lease Agreement, the Airport Authority agreed to not enter into an agreement with any other airline which provides more favorable terms, rents, fees, or charges than those offered to Via, unless the Airport Authority also makes a substantially similar agreement available to Via. *Id*. at B at § 601.

26.     Secondarily, Via entered into an agreement with the Airport Authority entitled "Ground Handling Agreement," which arranges for airport personnel to provide various passenger services, ramp services, cleaning services, towing, and deicing. A true and correct copy of the Ground Handling Agreement is attached hereto as **EXHIBIT 3**.

27.     Similarly, based on these promised services, Via agreed to remit payment on a monthly basis. *Id*. at § 7.1.

28.     In conjunction with Via's two-year EAS contract with the DOT, the terms of the two Airport Agreements commenced October 1, 2016 with the intention of expiring on November 30, 2018.

## VII.     THE AIRPORT AUTHORITY ROUTINELY AND UNJUSTIFIABLY INTERFERES WITH VIA'S AIR CARRIER OPERATIONS AND SERVICES

29.     Via currently operates flights into or out of the Airport seven days a week and is the only airport flying into or out of the Airport.

30.     Via utilizes its 50-seat Embraer ERJ-145 jets for flights into or out of the Airport.

31.     Each of Via's flights at the Airport are inbound from or outbound to Charlotte, North Carolina, with many of those flights continuing on to either Orlando, Florida or St. Augustine, Florida.

32.     Beginning in January 2017, officials with the Airport Authority, including the Airport's manager, engaged in a malicious campaign to complicate, frustrate, and harm Via's operations at the Airport.

33.     On December 31, 2016, Stephen Snyder, the Airport Authority's manager, unreasonably and unilaterally ordered the runways and airport closed to Via operations, effectively cancelling Via's already scheduled flights.

34.     The FAA and DOT, which are the only entities having Congressional authority to govern interstate air carrier routes and services preempted the Airport Authority by resuming Via's flight operations on January 9, 2017.

35.     During the Spring of 2017, Snyder and the Airport Authority continued a campaign to sabotage Via's operations by routinely soliciting negative media attention. Snyder frequently cited unfounded safety concerns and poor scheduling in newspaper interviews.

36.     Again, Snyder attempted to interfere with Via's routes and services by attempting to cancel Via's flight operations in the guise of safety concerns.  As before, Mr. Snyder and the Airport Authority were preempted by the FAA, as the FAA is the agency to determine an airline's safety.  The FAA, noting Via's impeccable safety record, prevented the Airport Authority from prohibiting Via's services to the Greenbrier Airport.

37.     On or about March 27, 2017, the Airport Authority permitted other air carriers to use Via's Exclusive Use Space.

38.      In addition to his successful media blitz, Snyder sent numerous communications to the DOT in an effort to force the DOT to cease using Via's EAS services at the Airport. Without having any cognizable reason to do so, the DOT has not heeded Snyder's false claims; Via remains obligated to provide scheduled airline services for the consuming public under the DOT's Order. Via does not have access or possession of these documents or information, but has submitted a request under the Freedom of Information Act from both the FAA and DOT.

39.     In general, the Airport Authority and Snyder have been uncooperative, have not provided for the use of ordinary maintenance and mechanical equipment, have prevented Via's use of mechanical storage, have precluded Via from exclusive use of airport areas and have constantly attempted to terminate and negate the DOT's Order by implementing roadblocks, false and misleading communications, and by interfering with Via's services, routes, and operations.

40.     Beginning as early as March 2017, Snyder and the Airport Authority began soliciting the DOT to rebid the EAS program for the Airport to select a new EAS air carrier in place of Via.

41.     In July 2017, Snyder informed the Executive Director of the Greenbrier County Convention and Visitors Bureau that "Via is an unsafe airline" in his efforts to build community support for a rebid.

42.     Based on the strained circumstances and difficulties the Airport Authority and Snyder caused in day to day operations, Via stipulated with the DOT to shorten its EAS term to run through March 31, 2018 instead of through November 2018.

43.     The DOT eventually issued an RFP and SkyWest Airlines was selected as the new carrier to begin scheduled services for the Airport on April 1, 2018.

44.     The Airport Authority has significantly reduced references to Via in its advertisement and marketing materials and have demoted Via's information, logo and information with SkyWest's.

45.     This action and conduct has made it clear that the Airport Authority has taken every action to eliminate Via from its premises with the hope of shuffling in SkyWest as an alternate carrier – before it is even permitted to do so under the DOT selection mandates.

46.     The Airport Authority refuses to work cooperatively with Via and has acted to make Via's scheduling, services, and operations impossible to perform.

47.     Via has acted in good faith, in full compliance with FAA regulations and DOT mandates. Nevertheless, the Airport Authority believes it somehow has supreme control over Via, its services, operations, and routes, and continues to implement obstruction after obstruction to prematurely force Via from complying with the federal authorities' mandates.

48.     As a total and transparent pretext to usher Via out and Sky West in, Mr. Snyder wrongfully and illegally terminated the Airport Agreements by letters dated December 22, 2017. On behalf of the Airport Authority, he has mandated that Via cease from using the Airport facilities as of **January 15, 2018**. This, despite Via's obligation to the DOT and consuming public to fly scheduled services up through March 31, 2018.

## VIII.   IMMINENT AND IRREPARABLE HARM TO VIA, THE DOT, AND TO THE CONSUMING PUBLIC

49.     Denying Via use and access to the Airport's runways, terminals, and other facilities, including the Airfield Operations Area and Exclusive Use Space within the terminal building, has substantially crippled Via's operations, routes and services at the Airport.

50.     Without access to the airport facilities and use of the ground handling services, Via is prevented from fulfilling its scheduled air services through the remainder of its EAS contract with the DOT.

51.     Via cannot takeoff or land its flights scheduled into or out of the Airport, despite having an obligation to the DOT to do so, and despite its obligation to travelling passengers.

52.     The inability to takeoff or land at the Airport will severely harm Via's operations, scheduled flights, will interfere with its DOT directives, will harm its reputation, and will result in substantial and irreparable harm to its business interests and goodwill.

53.     Specifically, between January 8, 2018 and March 31, 2018, Via currently has 284 scheduled EAS flights planned into or out of the Airport.

54.     In addition, Airport Authority's wrongful termination will cause substantial and irreparable harm to Via in its relationships with its customers and potential customers.

55.     The Airport Authority and Mr. Synder's actions have induced and will induce Via's inability to perform for the DOT or to service traveling passengers – at no fault of Via's.

56.     Specifically, between January 8, 2018 and March 31, 2018, Via currently has 318 passengers booked on flights into or out of the Airport who will be cancelled and deprived of the ability to fly into Lewisburg, WV, a community deemed by the DOT of special need of Via's air carrier services.

57.     Preventing Via from operating is an egregious abuse and encroachment on federal powers by the Airport Authority.  Mr. Snyder and the Airport Authority have acted and are acting as a supreme power with authority to override FAA decisions and the DOT's EAS selection at their whim, without due process, an opportunity to be heard, and in violation of the ADA.

58.     Based on Via's past performance and patterns, between January 15, 2018 and March 31, 2018 Via reliably expects to book hundreds of additional passengers each month on these 284 scheduled flights.

59.     Via has no ability to mitigate the harm and the consuming public has no alternative air carrier for scheduled service.  Congress, the FAA and the DOT prescribed the ADA, safety regulations, and the EAS program to specifically benefit the consuming public and to ensure air safety and scheduled service oversight.  With due respect, a single airport manager controlling the Airport Authority cannot supersede the United States Congress and federal administrative agencies at his whim.

60.     Mr. Snyder and the Airport Authority's actions, conduct and attempt to excommunicate Via from the Airport on January 15, 2018 have caused and will cause severe reputational harm to Via which likely resulted in lost business opportunities and will result in future lost business opportunities.

61.     Via's loss of goodwill among its customers and the general public has caused a loss in market share in the geographical area surrounding the Airport, which Via expects should have grown in the future.

62.     Via has a legitimate, existing, and ongoing fear that in addition to the harm Via has already suffered, the Airport Authority and Snyder will continue to wrongfully sabotage its business in the immediate and long-term future.

63.     In addition the Airport Authority's rates, amounts, and fees charged are stifling and do not comport with the ADA preemptive powers over the regulation of rates, routes, and services, and the amounts are unfair and unreasonable in violation of FAA Order 5190.6B.

## COUNT I
### (Airport Authority's Violation of Supremacy Clause)

64.     Via re-alleges and restates paragraphs 1-63 above as if they were fully set forth herein.

65.     State or local action that interferes with or is contrary to federal law or otherwise intrudes on federal jurisdiction violates the Supremacy Clause of the U.S. Constitution.  U.S. Const. Art. VI, cl. 2.

66.     The federal government clearly and completely has preempted all state laws relating to rates, routes, or services of any air carrier through the Federal Aviation Act, 49 U.S.C. § 40101 *et seq*. and the Airline Deregulation Act of 1978, 49 U.S.C. § 1301 *et seq*.

67.     In view of the pervasive scheme of federal regulation of aviation, an airport proprietor may only interfere with an air carrier's rates, routes, or services if the interference is a proper exercise of the authority's proprietary power.

68.     An authority's exercise of proprietary powers must be reasonable, nondiscriminatory, nonburdensome to interstate commerce, and designed not to conflict with the Airline Deregulation Act and its policies.

69.     Airport Authority is a public agency established under W. Va. Code, § 8-29a-1, *et seq.*, and the actions it takes constitute state enforcement action.

70.     Airport is part of the national air transportation system.

71.     Via is a certified commercial air carrier engaged in the operation of providing commercial air transportation throughout the country.

72.     Via's rates, routes, or services under the EAS program are prescribed under federal law.

73.     Airport Authority's actions and pretextual attempt to terminate the Airport Agreements are aimed at overriding the DOT's selection of Via as the Airport's EAS provider; the conduct has the intended effect of impermissibly interfering with Via's rates, routes, and services, which is preempted and within the sole province of federal law.

74.     The Airport Authority's attempts to terminate the Airport Agreements and corresponding actions constitute an unreasonable and discriminatory exercise of its proprietary powers, and are unduly burdensome to interstate commerce.

75.     For these reasons, the Airport Authority's termination of the Airport Agreements and corresponding actions exceed any legitimate scope of localized governing powers under the ADA and the Supremacy Clause.

76.     The Airport's action, conduct and attempts encroach upon and are inconsistent with the ADA and are preempted and prohibited by federal law.

WHEREFORE, the Plaintiff, VIA AIRLINES, INC, respectfully requests judgment in its favor and against the Defendant, GREENBRIER COUNTY AIRPORT AUTHORITY, for an order declaring Airport Authority's forthcoming termination of the Airport Agreements and corresponding actions to be unconstitutional and unlawful; for a preliminary and a permanent injunction preventing the Airport Authority and/or any of its agents from enforcing such termination; for the costs and expenses incurred by Plaintiff in prosecuting this action and any and all other relief deemed just and proper.

## COUNT II
### (Airport Authority's Tortious Interference with Via-USDOT Relationship)

77.     Via re-alleges and restates paragraphs 1-63 above as if they were fully set forth herein.

78.     Via was selected as the dedicated EAS air carrier serving passengers at the Airport.

79.     Via entered into an EAS program contract with the DOT and has an established business relationship with it.

80.     Via had an expectation to receive EAS subsidy payments from the DOT for transporting passengers to and from the Airport.  Via has an obligation to transport passengers to and from the Airport under its agreement and DOT directives.

81.     Airport Authority has knowledge of Via's business relationship with the DOT as it owns and operates the Airport and entered into the Airport Agreements with Via.  Moreover, the Airport actively sought and works with the DOT to procure scheduled service under the EAS program that appointed Via as the select carrier for transportation.

82.     It was Airport Authority's purposeful intent to put Via in such a desperate operational status that Via would not be able to complete scheduled flights in an effort to ruin Via's business, ability to operate, and to impugn Via's reputation.

83.     The Airport Authority wrongfully seeks to terminate the Airport Agreements, which prevents Via from accessing and utilizing the Airport, despite Via's lack of any breach and in light of Via's continued performance.

84.     The Airport Authority's actions have caused direct interference with Via's relationship with the DOT, FAA, and consuming pubic passengers.

85.     As a result of Airport Authority's tortious interference, Via has experienced significant and irreparable economic damage as well as reputational damage and loss of goodwill among its customers and potential customers.  The relationship with the FAA and DOT are being adversely affected by the Airport's actions and conduct and are resulting in significant industrial strife and harm.

WHEREFORE, the Plaintiff, VIA AIRLINES, INC., respectfully requests judgment in its favor and against Defendant, GREENBRIER COUNTY AIRPORT AUTHORITY, for injunctive relief to enjoin the forthcoming termination of the Airport Agreements, damages, costs, attorneys' fees, and any and all other relief deemed just and proper.

## <u>COUNT III</u>
### (Airport Authority's Tortious Interference with Via-Customer Relationships)

86.     Via re-alleges and restates paragraphs 1-63 above as if they were fully set forth herein.

87.     Via frequently schedules commercial flights into or out of the Airport.

88.     Via entered into contracts with its customers by selling commercial flights to its customers into or out of the Airport, and Via expects to sell more flights in the immediate future.

89.     Via has an established business relationship with its customers and has an expectation to receive payments from its customers.

90.     The Airport Authority has knowledge of Via's business relationship with its customers as it owns and operates the Airport and entered into the Airport Agreements with Via.

91.     The Airport Authority sought the assistance of the DOT to procure EAS services for the purpose of transporting the travelling public in and out of the Airport.

92.     It was Airport Authority's purposeful intent to put Via in such a desperate operational status that Via would not be able to complete scheduled flights and prove ruinous to Via's business and reputation.

93.     The Airport Authority is wrongfully terminating the Airport Agreements in the hope of preventing Via from accessing and utilizing the Airport and thereby preventing Via from operating and servicing its passengers.

94.     The Airport Authority's actions have caused direct interference with Via's relationship with its customers.

95.     As a result of Airport Authority's tortious interference, Via has experienced significant and irreparable economic damage as well as reputational damage and loss of goodwill among its customers and potential customers.

WHEREFORE, the Plaintiff, VIA AIRLINES, INC, respectfully request judgment in their favor and against Defendant, GREENBRIER COUNTY AIRPORT AUTHORITY, for injunctive relief to enjoin termination of the Airport Agreements, damages, costs, attorneys' fees, and any and all other relief deemed just and proper.

## JURY TRIAL DEMAND

Via respectfully requests a trial by jury on all issues so triable.

## PUNITIVE DAMAGES

Via respectfully requests punitive damages upon a proper showing of facts demonstrating entitlement thereto.

RESPECTFULLY submitted on this day of January 11, 2018.

HENDRICKSON & LONG, PLLC


_____/s/ Raj A. Shah_____
Raj A. Shah, Esquire (WVSB #11269)
John H. Tinney, Jr., Esquire (WVSB #6970)
214 Capitol Street
Charleston, WV 25301
Tel:  304-346-5500
Fax:  304-346-5515
rshah@handl.com
jtinney@handl.com


*Attorneys for Via Airlines, Inc.*

## VERIFICATION

VIA AIRLINES, INC.

By: _Katie Collins_ _____

Katie Collins _____
Printed Name

Director of Finance _____
Title

_1/11/2018_ _____
Dated

STATE OF FLORIDA     )
                     ) ss.
COUNTY OF ORANGE  )

Before me personally appeared _Katie Collins_____, who is

☒ personally known to me, OR

☐ has shown me his/her _____ for identification, and being duly sworn swears that he/she has read the forgoing Verified Complaint, and that the statements contained therein are true and correct.

SWORN TO AND SUBSCRIBED before me this _11th_ day of _January_____, 2018.

_____
NOTARY PUBLIC: State of
My Commission Expires:

BRITTANY GREALY
NOTARY PUBLIC - STATE OF FLORIDA
COMMISSION # FF106994
EXPIRES 3/26/2018
BONDED THRU 1-888-NOTARY1